LATTING v. CORDELL, Sec. of State Election Board, et al.

No. 32672. Aug. 19, 1946.

*172 P. 2d 397.*

Wm. F. Latting and Foster V. Phipps, both of Tulsa, for petitioner.

Mac Q. Williamson, Atty. Gen., and Fred Hansen, First Asst. Atty Gen., for respondents.

Holly L. Anderson, Samuel A. Boorstin, Frank Hickman, J. C. Pinkerton, and George H. Bowen, Chairman of Committee, Tulsa County Bar, amicus curiae.

DAVISON, J. This is an original action brought by petitioner, Wm. F. Latting, against J. Wm. Cordell, secretary of the State Election Board of Oklahoma, and Elmer Hale, chairman of the State Election Board of Oklahoma, and T. J. Lucado, member of the State Election Board of Oklahoma, respondents, to require respondents to cause his name to be printed upon the official ballots for the general election to be held in November, 1946, as the nominee of the Democratic party for the office of State Senator from Tulsa county.

In order to determine the petitioner's right to the writ of mandamus it is necessary for this court to construe the pertinent constitutional provisions of this state, which are sections 9, 9 (a), 9 (b), 10 (i), 10 (j), and 11 of article 5. They are as follows:

"Sec. 9. The Senate, except as hereinafter provided, shall consist of not more than forty-four members, whose term of office shall be four years: Provided, That one senator elected at the first election from each even numbered district shall hold office until the fifteenth day succeeding the regular state election in Nineteen Hundred and Eight, and one elected from each odd numbered district at said first election, shall hold office until the fifteenth day succeeding the day of the regular state election in Nineteen Hundred and Ten: And Provided further, That in districts electing two senators, the two elected at the first election shall cast lots in such manner as the Legislature may prescribe to determine which shall hold the long and which the short term.

"9 (a). At the time each senatorial apportionment is made after the year Nineteen Hundred and Ten the State shall be divided into forty-four districts to be called senatorial districts, each of which shall elect one senator; and the Senate shall always be composed of forty-four senators except that in event any county shall be entitled to three or more senators at the time of any apportionment such additional senator or senators shall be given such county in addition to the forty-four senators and the whole number to that extent. Said districts shall be numbered from one to forty-four, inclusive, and each of said districts shall contain as near as may be an equal number of inhabitants, such population to be ascertained by the next preceding Federal census, or in such manner as the Legislature may direct, and shall be in as compact form as practicable and shall remain unaltered until the next decennial period, and shall at all times consist of contiguous territory.

"9 (b). No county shall ever be di-

vided in the formation of a Senatorial district except to make two or more Senatorial districts wholly in such county . . .

"10 (i). Ascertaining the ratio of representation according to the Federal census, or such other enumeration as the Legislature may provide, . . . and apportioning the Senators, shall be done by the Legislature and be presented to the Governor for his approval in the same manner as other bills which may be passed by the Legislature.

"10 (j). An apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen, . . .

"11. Until the apportionment is made by the Legislature after the next Federal decennial census, the State, except as otherwise provided, shall be divided into thirty-three senatorial districts, each of which shall be composed of the counties as named, shall be numbered and elect senators as follows, namely: . . . Fourteenth, Canadian and Oklahoma, two senators; . . . Thirty-first, Tulsa and Washington, one senator; . . . "

At present Tulsa county has but one State Senator. The 1940 Federal decennial census gives Oklahoma a population of 2,336,034, and Tulsa county a population of 193,363, and it is conceded that if and when a proper senatorial apportionment act is enacted as contemplated by the Constitution, the people of Tulsa county will be entitled to nominate and elect three Senators. See Jones v. Freeman, 193 Okla. 554, 146 P. 2d 564. Tulsa county would also have been entitled to three Senators had the 1930 Federal decennial census been considered and acted upon by the Legislature.

The Legislature has, however, failed to pass a proper apportionment act since statehood and to date the Legislature has made provisions for the election of only one Senator from Tulsa county.

Petitioner states that the blame for Tulsa county's inadequate senatorial representation is squarely and solemnly at the door of the Legislature, which has refused to reapportion the state after each decennial Federal census as it is required to do by the Constitution. With this statement we fully agree, and unhesitatingly state the Legislature should abide by and follow the Constitution in this respect.

The petitioner argues that the question now before us does not relate entirely to legislative reapportionment and that the case of Jones v. Freeman, supra, is not decisive of the issue. With this we agree. All parties agree that the issue must be decided upon the construction of the exception clause in section 9 (a) of article 5, supra, and a determination of whether such clause is a self-executing provision. If it is self-executing, it is our duty to enforce it in the absence of legislation on the subject. A provision is self-executing when it can be given effect without the aid of legislation and there is nothing to indicate that legislation is contemplated to render it operative, and when there is a manifest intention that it should go into immediate effect, and no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed. 16 C.J.S. pg. 98, sec. 48. Does it indicate that it was intended as a present enactment, complete in itself, or does it contemplate subsequent legislation to carry it into effect? 11 Am. Jur. pg. 690, sec. 73; Ex parte Wagner, 21 Okla. 33, 95 P. 435.

It is a universally recognized rule of construction that, in ascertaining both the intent and general purpose, as well as the meaning, of a Constitution or a part thereof, it should be construed as a whole. As far as possible, each provision should be construed so as to harmonize with all the others, yet with a view to giving effect to each and every provision in so far as it shall be consistent with a construction of the instrument as a whole. 16 C.J.S. pg. 62, sec. 23, citing cases from practically every state in the Union, including

Finerty v. First Nat. Bank, 92 Okla. 102, 218 P. 859.

With the foregoing rules for constitutional construction in mind, we shall now analyze the wording of our Constitution to determine the thought in the minds of the framers of our Constitution with reference to whether the provision in question is self-executing.

It will be noted that throughout the pertinent parts of article 5, supra, the framers of the Constitution were addressing themselves to the Legislature. In section 9 it is said, "And Provided further, That in districts electing two senators, the two elected at the first election shall cast lots in such *manner as the Legislature may prescribe* to determine which shall hold the long and which the short term."

In section 9 (a), the section which contains the exception clause in controversy, the following language is noted: "and the senate shall always be composed of forty-four senators, except that in event any county shall be entitled to three or more senators at the time of any apportionment such additional senator or senators shall be given such county in addition to the forty-four senators and the whole number to that extent." The following language is also used: "Said districts shall be numbered from One to Forty-four, inclusive, and each of said districts shall contain as near as may be an equal number of inhabitants, such population to be ascertained by the next preceding Federal census, *or in such manner as the Legislature may direct* . . . "

Section 9 (b) provides in' part, as follows: "No county shall ever be divided in the formation of a senatorial district except to make two or more senatorial districts wholly in such county. . . . "

Section 10 (i) provides: "Ascertaining the ratio of representation according to the Federal census, or such other enumeration as the Legislature may provide, . . . and apportioning the senators, *shall be done by the Legislature . . .* "

Section 10 (j) provides: "*An apportionment by the Legislature* shall be subject to review by the Supreme Court at the suit of any citizen. . . . "

Section 11 provides: "*Until the apportionment is made by the Legislature* after the next Federal decennial census . . . "

Again referring to section 9 (a), we construe the language "at the time of any apportionment" as referring to the "senatorial apportionment" mentioned in the first line of said section, which apportionment was a duty delegated to the Legislature to make after the Federal decennial census of 1910, 1920, 1930, and 1940.

We are of the opinion that from the language used in the foregoing excerpts, the framers of our Constitution had no thought in mind other than to delegate the duties of apportionment solely to the Legislature. Throughout the whole article neither the court nor any other governmental agency is mentioned except to say that any act of apportionment shall be presented to the Governor for his approval and that an apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen, under such rules and regulations as the Legislature may prescribe.

It has been the general thought of the people of this state since the adoption of our Constitution that the sections involved herein were addressed solely to the Legislature insofar as apportionment acts are concerned. As proof of the correctness of this thought we are reminded that since 1910 Oklahoma county would have been entitled to two or more senators had the clause in question been thought by anyone to be self-executing, and Tulsa county would have been entitled to two or more senators since 1920. Until the present action was filed the question

now before us was never raised. This acquiesecence cannot justify a particular holding in this case, but the long and continued interpretation of the Constitution by such acquiescence is an aid in removing doubt as to the meaning of such constitutional provisions as intended by the framers thereof, Smiley v. Holm, 285 U.S. 355, 76 L. Ed. 795.

The purpose and intent of the framers of the Constitution in the insertion of the exception clause in question would be helpful in our determination of the question. However, our independent search through the proceedings of the Constitutional Convention, as pertains to the present question, has revealed nothing that would throw any light on the question.

We are of the opinion that the purpose of the exception clause was to increase the number of Senators in the more populated counties so that the larger counties could be given the number of Senators to which they were entitled without reducing the number of Senators to which the other parts of the state were entitled. See In re Dowling, 219 N.Y. 44, 113 N.E. 545.

We are of the view that the wording of the portions of the Constitution under consideration is clear and unambiguous and under the law the object of construction applied to a Constitution is to give effect to the intent of its framers, and of the people adopting it. This intent is to be found in the instrument itself; and when the text of a constitutional provision is not ambiguous the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument. Shaw v. Grumbine, 137 Okla. 95, 278 P. 311.

The petitioner argues that the sections of our Constitution now before us had their origin from the provisions of the New York Constitution of 1894. (This is true; Jones v. Freeman, supra.) Petitioner further argues that the "exception clause" which we have under discussion was not a part of the New York Constitution. Petitioner then says that the "exception clause" is peculiar to Oklahoma and that the framers of our Constitution were familiar with the fact that abuses had grown up under the New York Constitution and that it was "natural and inescapable that they would seek to place a provision in the Oklahoma Constitution which would prevent a repetition of the New York tragedy." The foregoing argument is based on an incorrect hypothesis. Petitioner has evidently overlooked a similar exception clause in section 4, article 3, of the New York Constitution of 1894, said clause being as follows: " . . . except that if any county having three or more senators at the time of any apportionment shall be entitled on such ratio to an additional senator or senators, such additional senator or senators shall be given to such county in addition to the fifty senators, and the whole number of senators shall be increased to that extent."

The above clause was considered by the Supreme Court of New York in the case of Burns v. Flynn, Secretary of State, et al., 155 Misc. 742, 281 N.Y.S. 494, and affirmed on appeal by the Court of Appeals of New York in Burns v. Flynn, Secretary of State, et al., 268 N.Y. 601, 198 N.E. 424. In that case a writ of mandamus was sought to command the Secretary of State to certify to the Board of Elections that the citizens of Queens county should elect four (instead of two) State Senators, and require him to prepare ballots and conduct the election primaries so that the citizens of Queens county should have the right to vote for and elect such officers. The writ was denied on the theory that the matter of apportionment of representatives in the State Senate was a duty committed exclusively to the Legislature and not to the courts. In said case the following language was used:

"This court cannot do that which the Legislature has failed to do . . . It may well be that the Legislature has failed to function in respect to apportion-

ment of Senators and Assemblymen, but such failure on the part of that legislative body to act certainly does not give this court power to order an apportionment or assignment of legislative representatives."

It might be interesting to note that in 1943 the New York Legislature enacted a valid apportionment statute which gave to Queens county the four Senators to which it was entitled, and increased the total number of Senators to be elected to 56. See In re Fay, 291 N.Y. 198, 52 N.E. 2d 97.

We are in accord with the holding in Burns v. Flynn, supra.

Since this particular question has probably never been called to the attention of the Legislature, it is assumed that that body will do its duty in the matter at the first opportunity. However, as pointed out in the case of Jones v. Freeman, supra, the people may initiate a bill to cure the present situation, or they may follow the example of a number of other states and amend the Constitution so as to guarantee a proper apportionment of the state for legislative purposes.

Writ denied.

GIBSON, C. J., HURST, V.C.J., and OSBORN, BAYLESS, WELCH, CORN, and ARNOLD, JJ., concur. RILEY, J., dissents.

RILEY, J. (dissenting). "The ballot is an instrument that comes down as still as snow flakes fall upon the sod, but executes a freedman's will as lightning does the will of God." In re Initiative Petition, 157 Okla. 54, 60, 10 P. 2d 271, 277.

Compliance by the majority with the requirement of section 5, article 7, Constitution of Oklahoma, that "The Supreme Court shall render a written opinion in each case," applied to proceedings invoking (section 8, article 7, Constitution) original jurisdiction (section 2, idem) vested in the courts (section 1, idem), is gratifying to the proprieties of a people's government. It is fitting that the court of last resort promulgate a written and reasoned opinion in such cases, whether the writ be granted or denied.

However, majority compliance with these requirements of Constitution seems to be filled with oddities, perversions, and monstrosities. The statement of facts, by which rights under applicable law are measured, is incomplete. It is material to the relief sought, whether it be granted by this court or under exercise of the powers vested in the Senate (section 30, article 5, Const.), that the facts be stated that on April 26, 1946, and within time provided by statute, petitioner tendered to the respondent board his notification and declaration as prescribed by statute, as a candidate for the Democratic nomination for the office of Senator from Tulsa county, and petitioner's tender by the board was rejected under the view that the office was nonexistent. No other person sought the office, so that petitioner is an unopposed candidate and if by the exception clause contained in section 9a, art. 5, Constitution, the office exists, petitioner, by virtue of Title 26, O.S. 1941, § 126, is entitled to a certificate of nomination to the office. Dancy v. Peebly, 132 Okla. 84, 270 P. 311. And since he is unopposed by any other nominee of a political party or an independent candidate, by default or upon the casting of one or more ballots in his favor, which may be done by writing the petitioner's name in upon the ballot (State v. Lasher, 116 Okla. 273, 244 P. 809), he will be elected to the office, for one's status as a nominee does not depend upon the issuance of a certificate of nomination (State v. Lasher, supra), as the certificate of nomination or election is prima facie evidence of his right. O'Brien v. Gassaway, 125 Okla. 97, 256 P. 929. The certificate is a mere muniment of title to the office.

The relief sought by petitioner is incorrectly stated. Petitioner did not primarily seek the issuance of a writ

"to require respondent to cause his name to be printed upon the official ballot for the general election to be held in November, 1946 . . . " but that relief, by petitioner, was only sought alternatively by the issuance of the writ. Primarily, petitioner seeks, by the issuance of a writ, to require the respondent board to receive and file, as of April 26, 1946, his notification and declaration of candidacy for the office, and in view of his having been an unopposed candidate for the party nomination to the office and the primary election having been held, the petitioner seeks, by the writ, to require the respondent board to issue to him a certificate of nomination to the office as provided by statute, supra.

The decision denying the writ as supported by the majority opinion is not clear. But a conclusion may be drawn therefrom that vacillates the view (1) that the exception clause contained in section 9a, art. 5, Constitution, not being self-executing, the office of Senator for Tulsa County does not exist, and (2) for the reason that section 30, art. 5, Constitution, providing "Each house shall be the judge of the election returns and qualifications of its own members", the matter is wholly within the province of the Senate and it will have "exclusive jurisdiction in such cases affecting candidates for membership therein and neither the State Election Board nor the courts may interfere in such matters". Daniel v. Bound (1938) 184 Okla. 161, 85 P. 2d 759.

The latter view is supported by the statements contained in the majority opinion (a) "The petitioner argues that the question now before us does not relate entirely to legislative apportionment and that the case of Jones v. Freeman, supra (193 Okla. 554, 146 P. 2d 564), is not decisive of the issue. With this we agree." And (b) "since this particular question has probably never been called to the attention of the Legislature, it is assumed that that body will do its duty in the matter at the first opportunity".

While the judicial department of government cannot encroach or interfere with the legislative department in proper exercise of its constitutional powers, 16 C.J.S. 446, para. 151, it does not follow that the two departments can never both exercise powers in the same field. Clark v. Austin, 340 Mo. 467, 101 S. W. 2d 977.

The courts have no general supervision over legislation and they cannot review or control the discretion of the Legislature as to matters within its province. The courts cannot compel or enjoin the exercise of legislative powers, and the courts have no authority to avoid the effect of the failure of a Legislature to perform its duties. 16 C.J.S. 448. It is the function of the courts not to make, but to interpret and apply the laws, idem, whether the laws have source within the Constitution or the statutes.

The preamble of Constitution denotes a state purpose "to secure just and rightful government". Governments can be maintained only through the services of men. Men's services ordinarily may be had only by being paid for. It has ever been the legislative duty to provide by law an annual tax sufficient, with other revenue, to defray the estimated ordinary expenses of the state for each fiscal year, sec. 2, art. 10, Const., and it is the legislative function to make appropriations of money from the public revenue. Nevertheless, when the Legislature failed in its duty and affirmatively transgressed by providing a purported estoppel against the judges to claim the full payment of their salary and a liability on the part of paymasters of the state for paying the amount fixed, which could not be increased or decreased during tenure of office, when, in short, it was sought to "make judges dependent upon his will alone for the tenure of their office and the amount and payment of their salaries," the matter presented a justiciable issue. Despite legislative failure and encroachment, the judges were paid. Riley v. Carter, 165 Okla. 262, 284, 25 P. 2d 666, 687.

There is little, if any, distinction between the phrase contained in the Constitution providing the judges shall be paid monthly an annual salary fixed by law, and the words contained in the exception of sec. 9a, art. 5, Constitution, which, in view of the population of the state and Tulsa county, of which courts will take judicial notice, grants to petitioner and the citizens of the county a right within the elective franchise. "In the event any county shall be entitled to three or more Senators at the time of any apportionment, such additional Senator or Senators shall be given such county in addition to the forty-four Senators and the whole number to that extent".

Each right considered was originally placed at the door of the legislative chamber and both were ignored. Jones v. Freeman. In the salary case, the safeguard, by the people provided, avoided destruction of their government. The provisions were self-executing. And this was so despite the general provision of Constitution, sec. 45, art. 5, recited and relied upon by the majority, devolving a duty upon the Legislature to effectuate Constitution.

Again, in State ex rel. Cloud v. State Election Bd., 169 Okla. 363, 36 P. 2d 20, 94 A.L.R. 1007, wherein this court spoke in an opinion prepared by Mr. Justice Osborn, sec. 30, art. 5, of the Constitution as interpreted and applied did not divest this court of jurisdiction to determine eligibility of a person for legislative membership. He had been convicted of a felony, divested of his citizenship, but had had restoration of it by an unconditioned pardon. Therein, as here, the nominee sought to have his name placed upon the ballot in the general election. But that candidate was not without opposition and it was reasoned that without his name being placed on the ballot he would not likely be elected to the office and sec. 30, art. 5, Const., supra, was held to have no field of operation until after the election. There was nothing then contained in the Constitution which precluded this court from passing upon the principal issue now involved. But sec. 1, art. 7, Constitution, vesting the judicial power of the state in the courts, and sec. 6, art. 2, Constitution, providing the courts of justice of the state shall be open to every person and speedy and certain remedy afforded for every wrong, were given full scope.

In Simpson v. Hill, 128 Okla. 269, 263 P. 635, 56 A.L.R. 706, this court was called upon to determine, and did determine, that the Legislature was not in lawful session. In Kansas, in the Prouty Case (1873), 11 Kan. 235, quoted, 107 A.L.R. 218, the Supreme Court held a litigant might effectively show that certain persons were allowed to vote as representatives of districts which had no existence and the judgment of a single house that there were such districts did not conclude the right.

"The district must exist", said the illustrious Brewer, "before it can be represented" and "the decision of the house as to who shall represent this district is conclusive and final" only where the district exists. Great minds, it has been said, run in the same channel. The analogy between the operating effect of sec. 30, art. 5, Constitution, as expressed by Mr. Justice Osborn, which requires the election of the candidate to the Legislature before the House may judge of the election and qualifications of its members, and the expression of Mr. Justice Brewer of the necessity of the existence of the district from which the officer may be elected prior to the operative effect of such legislative power vested, is striking.

The existence of office of Senator is the gravamen of the case at bar, and the allied cases. That issue ought to be determined as a matter of law by the courts, and not relegated to the discretion of a single house of the Legislature. Neither should the adjudicated wrong as to the representative right of citizens of more populous counties be made to suffer the pleasure of a single house of the Legislature, nor of the

Legislature as a whole by the enactment of a legislative apportionment act if the exception contained in sec. 9a, supra, is severable from the mandate of the provision enjoining a duty upon the Legislature and if the right granted by the exception requires no legislation for its fulfillment. The administrative board is subject to the general superintending control of this court (sec. 2, art. 7, Const.) and mandamus is the proper remedy. Matney v. King, 20 Okla. 22, 93 P. 737.

While it is immaterial to the issue presented, the majority err in paragraph 2 of the syllabus of the opinion, for courts do have jurisdiction over acts of the Legislature providing an apportionment. Whenever such measure is enacted and approved, it is subject to review by the Supreme Court at the suit of any citizen. Sec. 10j, art. 5, Const. of Okla. Prior to the adoption of the amendment in New York, subjecting such an act to review, the rule there was as stated by the majority. But sec. 10j, supra, was adopted in view of the construction placed upon it.

It is an oddity that the majority state (1) "the purpose of the exception clause was to increase the number of Senators in the more populated counties so that the large counties could be given the number of Senators to which they were entitled without reducing the number of Senators to which the other parts of the state were entitled. (See In re Dowling, 219 N. Y. 44, 113 N.E. 545)"; (2) "the wording of the portions of the Constitution under consideration is clear and unambiguous and under the law the object of construction applied to a Constitution is to give effect to the intention of its framers and the people adopting it" to deny relief. The decision in the Dowling Case was in review of an apportionment act, not as to the rights of populous counties to senatorial representatives irrespective of an act. (3) " . . . A similar exception clause in sec. 4, art. 3, of the New York Constitution of 1894 . . . was considered . . . in Burns v. Flynn, Secretary of State, et al, 155 Misc. 742, 281 N.Y.S. 494, and affirmed on appeal by the Court of Appeals . . . Burns v. Flynn, Secretary of State, et al., 268 N. Y. 601, 198 N.E. 424, . . . the following language was used: 'This court cannot do that which the Legislature has failed to do (enact an apportionment statute for representatives in State Senate and Assembly) . . . but such failure . . . certainly does not give this court power to order an apportionment or assignment of legislative representative'.".

The reason assigned for the decision in the opinion, supra, denying the right given by the exception and allowing, under the conditions, additional senators to Queens county was that "It is provided by the Constitution and by laws that members of the Legislature must be elected by districts". Thus, in New York, the exception was clearly not self-executing. Not so, however, in Oklahoma, for sec. 17, art. 5, Constitution, prescribing qualifications of Senators and Representatives, requires "they shall be qualified electors in their respective counties or districts and shall reside in their respective counties or districts during their term of office". Thus it is contemplated that a county may, as it does, under the constitutional apportionment as to Tulsa county, embrace the whole county, not districted. The exception of sec. 9a, supra, proprio vigore constitutes of a county of a specified population, a senatorial district. There is no constitutional requirement that a county in Oklahoma shall be districted. In fact, sec. 9b, art. 5, Const., prohibits division of a county to form a senatorial district and provides an additional exception which grants permissive authority to the Legislature by which a county may be divided to make two or more senatorial districts wholly within such county.

There is no necessity whatever for the legislative exercise of the discretion vested. Consequently, as differentiated from New York, there is no requirement in Oklahoma that members of the Legislature must be elected by districts.

The majority opinion recites that the records of the Constitutional Convention would be persuasive if transcribed and available, and the majority opinion correctly draws from the Dowling Case the purpose and intent of the constitutional exception under consideration. Therein the records of the Constitutional Convention of New York, Vol. 4, p. 648, are quoted at length. In view of the rule that Constitutions and statutes are adopted in view of the constructions placed upon them, it would seem that the construction placed upon the exception in New York would satisfy the query. It was said, "In other words, this scheme contemplates simply that the present apportionment may always remain, but you may add a district when it has sufficient to give it another Senator". Adoption of the exception under the setting, differentiated as it is in Oklahoma without requirement of the election of Senators from districts, but resting the matter within permissive authority of the Legislature to provide districts wholly within a county at a specified time, shows clearly that the right, by the exception granted, is separable from the matter of legislative apportionment and that it requires no legislation for fulfillment of the right of populous counties to additional Senators.

The convention of New York, in its address to the people, said: "Somewhere in every representative government there should be a recognition of variety of interests and extent of territory as well as of mere numbers united in interest and location . . . it is the rule, rather than the exception, throughout the Union".

In the cited case the words of the exception "time of any apportionment" were deemed important to put a limit upon all changes in number and apportionment of Senators. It was said "when . . . the number of Senators by the ratio, as provided, is determined, all the counties then entitled to three or more Senators are to have the number of Senators to which they are so entitled . . . If by the ratio any county is entitled to an additional Senator or Senators, such additional Senator or Senators must be given to such county, and the number of Senators in the state must be increased accordingly, such interpretation respects all the provisions of the Constitution".

Respecting all provisions of the Constitution of the State of Oklahoma, it is believed the exception is self-executing.

"Does the exception clause contemplate subsequent legislation to carry it into effect? Does it indicate that it was intended as a present enactment, complete in itself as definite legislation? If the nature and extent of the right conferred . . . is fixed . . . so that they can be determined by . . . construction of its own terms," then the exception should be determined to be self-executing. Ex parte Wagner, 21 Okla. 33, 95 P. 435 (1908) Williams, C. J.

A proviso defeats only conditionally the operation of an enactment. It avoids by way of defeasance or excuse. But an exception takes out something which would otherwise be a part of the subject matter. Rowell v. Janvrin, 151 N. Y. 60, 45 N. E. 398.

As observed, the thing is severable from an apportionment act and the county's right of senatorial representation is not an inseparable incident of a legislative act. It is a thing that may be had at the intervals of time stated and one that doth properly belong. It is a particular out of a general thing. It is certainly described. Frank v. Myers, 97 Ala. 437, 11 So. 832; Campbell v. Jackman Bros., 118 N. W. 755, 140 Iowa, 475, 27 L.R.A. (N.S.) 288; 16 C.J.S. 66, para. 25.

Since, then, the exception excludes the county's right of senatorial representation from the duty devolved upon the Legislature to make an apportionment, and in view of the purpose of the exception not to defeat legislative division of the state into 44 senatorial

districts each of which shall elect one Senator, or to reduce the senatorial representation of the more sparsely populated areas, intended decennially to be legislatively apportioned, it matters not whether the Legislature give to such counties as Tulsa that to which they are entitled, or whether relief be by the courts afforded. No legislation is necessary, notwithstanding permissive authority by the exception of 9b, supra, is vested in the Legislature to subdivide counties into senatorial districts.

In consequence of the exceptions, the rule stated in the first paragraph of the syllabus of the opinion is erroneously applied. The application made by the rule is to resolve the intention as one to devolve upon the Legislature the sole duty of apportionment and assignment of offices to be filled and this as an inseparable constitutional provision.

In the event the Legislature, by apportionment act, properly divided the state into districts as nearly equal as may be in population, and finding that Tulsa and Oklahoma counties were entitled, under the ratio, to 4 and 3 additional senators, respectively, indubitably the Legislature, by separate act, might reiterate the words of the constitutional exception, and if so, since things that are equal to the same thing are equal to each other, how can it be said that such an act would be unconstitutional and void?

It is not fair to rely, as the majority do, upon the excerpt of sec. 11, art. 5, Const., as follows: "Until the apportionment is made by the Legislature after the next Federal decennial census . . . " to argue that the Legislature, like Tennyson's brook, flows on forever as heretofore constituted, when the provision from which the excerpt is taken significantly makes out of the words "except as otherwise provided".

The initiative and referendum provisions of Constitution, considered in the Wagner Case, supra, are fair illustrations of a nonself-executing constitutional provision. There the expression is used, "The Legislature shall make suitable provision for carrying into effect the provisions of this article". Therein no reliance is had upon the general guaranty requiring the Legislature to effectuate (sec. 45, art. 5, the Const.) and the requirement for legislative provision as to initiative and referendum right is shown to have been inserted so that statehood would be proclaimed, despite apprehensions that those opposed might convince the Department of Justice, and through it the President, that by reason of the initiative and referendum, if self-executing, the proposed state would be rendered non-Republican in form.

Since all political power is inherent in the people and governments are instituted for their protection, security, and benefit (sec. 1, art. 2, Const.), the people have the right of legislation within their Constitution and the will of the people is the highest law. In the case at bar that will has been adequately expressed.

Whether in government, God or the people be regarded as the source of political power, authority must be exercised by intermediate persons who are themselves subjects. They exercise only delegated power; they are not in themselves rulers because dependent upon a superior power which confers upon them authority which they do not themselves possess. Theory of State, Osford, 1892.

The state is indestructible, a democratic state cannot surrender sovereignty for the simple reason that it is not sovereign. Only a totalitarian or Fascist state is sovereign. Reves.

The people then being sovereign as possessor of an inherent and reserved right such as may not be usurped or bartered away (State v. Hay, 126 N.C. 999, 35 S.E. 415), in the absence of an expressed intent to delegate to the Legislature a duty to be performed as a condition precedent to the enjoyment of a right clearly granted, the people of populous counties or "any citizen" as

representative of them, in a class action, has right to apply by petition to those invested with the powers of government for redress of grievances. Sec. 3, art. 2, Const.

As heretofore sustained in cases as to the individual's "right to run" and as to his qualifications, State ex rel. Cloud, supra, this court by virtue of sec. 6, art. 2, Const., found it proper to grant relief, for "the courts of justice of the state shall be open to every person and speedy and certain remedy afforded for every wrong . . . and right and justice shall be administered without . . . denial or delay . . . " Right in government is relatively denied when equality of representation is withheld. So the issue at bar affects democracy itself. Stigletz v. Schardien, 239 Ky. 799, 40 S.W. 2d 315.

The majority recite the general thought of the people with bearing upon the non-self-executing character of the exception. I am at loss to know how the general thought of the people by the majority is ascertained. The Legislature has enacted piecemeal legislation upon the subject matter, which this court has stricken down. The people may have been hopeful for a full performance of legislative duty. At least this court was, Jones v. Freeman, supra. But the majority recite: "The long and continued interpretation of the Constitution by such acquiescence is an aid in removing doubt as to the meaning . . . ". Interpretation contemplates an action, whereas acquiescence is non-action. But there has not been a total absence of action. The piecemeal legislation pro tanto served either the legislators or the people.

But the purpose of courts is not to give effect to the public will but to declare the law. The law may be an expression of public will, but it is an a priori declaration made upon due deliberation and when a court is called upon to give effect to the law, popular feeling may be at variance with it. A chief object of law is to place a check upon power, to make emotion subject to reason, and to accomplish this, the law must maintain its principle of growth. The evolution of law should be coincident with the evolution of human rights. Courts should not be guided by acquiescence because the law is a voiceless magistrate, while a magistrate is law made vocal. Judicial reliance upon the silent acquiescence of the people is a mode of action denounced by Aristotle. He said: "Those who have any complaint to bring against the magistrate say 'let the people be judges'. The people are too happy to accept the invitation and so the authority of every officer is undermined. Where the laws have no authority there is no constitution". Authority and power do not await the judgment of the people; theirs is not the immediate answer, but they may give answer on another occasion. The people framed by an appropriate agency a constitution and at the ballot box adopted it. They were familiar with the experiments of ancient Greece and of the mistakes of the early Anglo-Saxons. They avoided both rule by the mob as well as that of an autocracy. They established Federally a republic and a state in the nature of a commonwealth. These they devoted to law and order. Time and space should not be abused to demonstrate that *la loi* is narrower than *le droit*. Dugit. Law is more than a statute, just as a statute is more than a custom of doing things. There is coercive power in law and there is danger in perpetual quiescence as in perpetual motion. Cardozo. Uncertainty in customs or the mode of doing things is to be corrected by a higher law when deformities of the system are known. Cardozo suggests that courts in future cases with courage to unmask the pretense must act if we are to reach a peace that will abide the fleeting hour. As Cardozo expressed it, "The inn that shelters for the night is not the journey's end".

"The law, like the traveler, must be ready for tomorrow with principal and growth." "When, then," he inquires,

"does rule put off the vestments of authority to become law. When is law to become a science par excellence and of prediction as to contemplated conduct; so that duties and rights will be weighed and measured at the same time and· in the same balance and by the same rules of that which ought to be? When will we learn that if a group of people omit or suspend performance of a duty they too will suffer". Holmes. When will we learn that law is not a creature of statute and if it is not satisfied with justice it will produce a disturbance and equilibrium of the state and return the state for an adjustment to an equality and an equilibrium.

Wilson thought we needed judges who could not only see the knothole in the barn door but as well the door. Governor Murray's life ambition was to make a thing so plain that even the Supreme Court would understand it.

But some are the creatures of administration. They think that obedience is the law of life. These are normal rules of respect but normal rules certainly cease to be constructive when in a day of triumph judgments are pronounced which determine our future course. Proper powers in government do not admit of arbitrary rule and, except upon the battlefield, never will.

The correct rule is that long acquiescence by the people in legislative or judicial construction of constitutional provisions is entitled to create weight with the courts. 16 C.J. 74, para. 34. The rule contemplates a contemporaneous, uniform legislative or executive construction adopted and acted upon with acquiescence for many years. Glasco v. State Election Board, 121 Okla. 119, 248 P. 642. But such a construction is not controlling and plain, direct, and unambiguous provisions of Constitution cannot be modified or amended by practice and custom no matter how long continued. Koenig v. Flynn, 258 N. Y. 292, 179 N. E. 705, affirmed 254 N.Y.S. 339, certiorari 76 L. Ed. 927, affirmed 76 L. Ed. 805.

Likewise, the rule prevails that by adopting a constitutional provision similar or identical to that contained in the Constitution of another state, it is presumed that such provision was adopted with the construction previously placed upon it. 16 C.J.S. 76; State v. Election Board, 181 Okla. 622, 75 P. 2d 861. For it is presumed the framers of such Constitution were conversant with and designed also to adopt any construction placed upon such provisions or exceptions in such other jurisdiction. State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S.W. 641.

"Where the matter with which a given section of the Constitution deals is divisible, one clause thereof may be self-executing and the other clause or clauses may not be self-executing." 16 C.J.S. 98, sec. 48; In re Interrogations, 99 Colo. 591, 65 P. 2d 7.

Such an exception is self-executing "when there is a manifest intention that they should go into immediate effect, and no ancillary legislation is necessary to the enjoyment of a right given." Atchison, T. & S. F. R. Co. v. Excise Board, 168 Okla. 619, 35 P. 2d 274; Zachary v. City of Wagoner, 146 Okla. 268, 292 P. 345; Fehr v. Black Petroleum Corp., 103 Okla. 241, 229 P. 1048.

That a right granted by a constitutional provision may be better or further protected by supplementary legislation does not, of itself, prevent the provision from being self-executing, nor does the self-executing character of a constitutional provision preclude legislation for the better protection of the right secured. Ladd & Tilton Bank v. Frawley, 98 Ore. 241, 193 P. 916; State ex rel. R. J. Edwards, Inc., v. Keith, 179 Okla. 563, 66 P. 2d 1059; Carmichael v. Holmes, 163 Okla. 27, 20 P. 2d 1053; In re Initiative Petition, 157 Okla. 54, 10 P. 2d 271.

Prohibitive and restrictive provisions are self-executing and may be enforced by the courts independently of any legislative action; otherwise, the

Legislature would have power practically to nullify a Constitution. Brice v. McDow, 116 S. Car. 324, 108 S. E. 84.

The exception grants a right obtainable at a stated time, the Legislature has no discretion to withhold the right, grant it, or provide another method for representation. In re Dowling, supra. The act apportioning New York state into 51 districts was held void, as the state was limited to 50 districts together with additional senators limited to the populous counties.

If a provision supplies a rule for enforcement, it is self - executing. Ex parte Smith, 24 Okla. Cr. 415, 218 P. 708, citing 12 C.J. 731, note 70; Leedy v. Brown, 27 Okla. 489, 113 P. 177. This is the rule as to constitutional provisions conferring privileges and complete within themselves. 16 C.J.S. 104; Williams v. City of Norman, 85 Okla. 230, 205 P. 144.

It is recognized federally in a congressional apportionment case, Colegrove v. Green et al. (June 10, 1946) 66 S. Ct. 1198, that issues of a political nature are not "mete for judicial determination" and a complaint may be dismissed for want of equity and that from such issues the Supreme Court of the United States has traditionally held aloof. But see Smiley v. Holm, 285, U. S. 355, 76 L. Ed. 795; Smith v. Texas 311 U. S. 128, 85 L. Ed. 84; Lane v. Wilson, 307 U. S. 268, 83 L. Ed. 1281. In the cited case, apppellants were relegated to the power vested in Congress, as the court would not "enter the political thicket', but while Congress is expressly declared to be final judge of the qualifications of its own members, yet it is the duty of the state courts to require the public officers of the state to comply with state law, and where no certificate of election has been issued and no return has been transmitted, and where neither candidate has been accepted or sworn in as a member, the courts of the state are open to the candidate complaining that a certificate was about to be issued in violation of law. People ex rel. Brown v. Board of

Supervisors, Suffolk County et al. (New York) 110 N. E. 776. It would seem that a right to a certificate as well as a wrong in the issuance of it presents a justiciable issue. State ex rel. Cloud, supra.

Federally, the most fundamental principle of constitutional adjudication is not to face constitutional questions, but to avoid them, if at all possible. U. S. v. Lovett, 66 S. Ct. 1073, cited in concurring opinion Colegrove v. Green, supra. So the Supreme Court of the United States developed for its gross governance in cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large portion of all the constitutional questions pressed upon it for decision. But no rule of law results from the recent case cited. Mr. Justice Rutledge, by concurring opinion, agrees with Mr. Justices Black, Douglas, and Murphy, who dissented, and Mr. Justice Jackson took no part in the case. Of necessity, the result left less than a majority sponsoring the law of the case. And, as in Coleman v. Miller, 83 L. Ed. 1385, 122 A.L.R. 695, an unusual situation was presented. But in congressional apportionment cases there is no specific constitutional requirement as exists in section 9a, art 5, Const. of Okla., requiring as to senatorial districts that "each of said districts shall contain as near as may be an equal number of inhabitants." But in Coleman v. Miller implications derived from general provisions of the Constitution suffice for the contrary view.

I am unable to understand how the Legislature, by inaction, in view of the right granted by the exception, may destroy the effectiveness of the citizens' vote or deny right of representation in the Senate. Heretofore, right to the exercise of the elective franchise, including the right of seeking election to public office, has been considered by this court as presenting a justiciable issue and not one political or governmental in its nature such as by state courts would be tabooed. Fitzpatrick

v. McAlister, 121 Okla. 83, 248 P. 569; Harding v. State Election Board, 197 Okla. 208, 170 P. 2d 208; Love v. State Election Board, 197 Okla. 165, 193, 170 P. 2d 191, 193; State ex rel. Bailey v. State Election Board, 197 Okla. 167, 170 P. 2d 206; Turner v. State Election Board, 197 Okla. 153, 169 P. 2d 285.

In Jones v. Cordell, 197 Okla. 61, 168 P. 2d 130, this court recently considered justiciable at the suit of any citizen of the state, the validity of an act making change in a senatorial nominating district. There was no avoidance because of political consideration.

The Federal courts, contrary to the state experience, do not hold that political questions are not justiciable in the Federal courts. 122 A.L.R. 695; In re Boynton v. Public Service Com., 135 Kan. 491, 11 P. 2d 999. In Kansas it is said, "We think the right of the parties to maintain the action is beyond question," and the Supreme Court, Coleman v. Miller, supra, held that had the question been solely a matter of state law it would have sustained it. But in Coleman v. Miller the court was equally divided upon the question of whether a justiciable issue or a question political in its nature, and hence not justiciable, was presented. The initiative and referendum issue, in its effect upon the existence of a government republican in form within the state, was federally considered as such an issue, Pacific States T. & T. Co. v. Oregon, 223 U. S. 118, 56 L. Ed. 377, for that governmental problem was specifically by Federal Constitution vested in the President. It is difficult to ascertain in Colegrove v. Green, as in Coleman v. Miller, what really did happen, for the court had jurisdiction and as recited in 48 Yale Law Journal, 1455, noted in 122 A.L.R. 725, the court being equally divided and Mr. Justice Jackson not participating, Justice Rutledge concurred in the result but also concurred in parts of the dissenting opinion, presenting the novelty of "sawing a justice in half" and having him walk away whole. The annotator, ·p. 727, says the Supreme Court has manifested considerable finesse in maintaining its jurisdiction for possible future purposes, but under the rules here announced, such astuteness cannot be attributed to the majority in the case at bar.

In the previously adjudicated political cases, veterans returning from war have found resistance as against their participation in government. Yet in most every instance that resistance has yielded to the same qualities experienced by them in quelling the threat of foreign totalitarianism from abroad. Some of the returning veterans seem to think representatives of them should help shape the nature of the government by them defended and they rely upon thoughts as expressed by T. E. Lawrence, after World War I: "When we had achieved and the new world dawned, the old men came out again and took from us the victory and remade it in the line of the former world they knew. Youth could win, but had not learned to keep, and was pitiably weak against age. We stammered that we had worked for a new Heaven and a new earth, and they thanked us kindly and made their peace".

President Roosevelt, 1942, said: "This time the achievement of our fighting forces will not be thrown away by political cynicism and timidity and incompetence. Before World War I very few people in any country believed that you had a right to speak for itself as a group or to participate in councils of state, we have learned much since then. We know that wisdom does not come necessarily with the years; that old men may be foolish and young men may be wise."

Prior to the rebellion after James Otis had issued his pamphlet declaring "If we are not represented, we are slaves," and when Massachusetts and Pennsylvania had resolved that imposition of duties and taxes by the Parliament of Great Britain upon a people not represented in the House of Commons is absolutely irreconcilable with their

384

rights, Benjamin Franklin submitted himself to parliamentary examination and said "They are entitled to all the privileges and liberties of Englishmen . . . one of the privileges of English subjects is that they are not to be taxed but by their common consent, they therefore relied upon it from the first settlement of the province that the Parliament never would or could . . . assume a right of taxing them, till it had qualified itself to exercise such right by admitting representatives from the people to be taxed, who ought to make a part of that common consent".

Had Spain treated its subjects in Cuba with anything like reasonable consideration that loyalty need not have been turned to hate, but the island, in a state of chronic revolt until 1868, until interference of the United States over the loss of the Maine, foreshadowed the result of tyranny.

The Legislature, in its relation to the courts of the state, is by no means the prototype of Congress nor of the British Parliament, where power, according to Lord Coke, is transcendent and absolute. Congress has power to prescribe rules of evidence (Tott v. U. S., 87 L. Ed 1519), and control proceedings in a pending case, Hass v. U.S., 93 Fed. 2d 427. Not so in Oklahoma. Section 52, art. 5, Const. With us, rights and remedies are fixed by Constitution. Dowler v. State, 179 Okla. 532, 66 P. 2d 1081.

The Legislature may not increase, decrease, or alter powers or duties of an agency of the state government where such powers and duties are defined by State Constitution. City of Denison v. Municipal Gas Co., 117 Tex. 291, 3 S.W. 2d 794.

What the Constitution grants, no statute may take away. State v. Brown, 105 Ohio St. 479, 138 N.E. 230. The scope and purpose of such exception may not be restricted by adverse legislation. L. & T. Bank v. Frawley, 98 Ore. 241, 193 P. 916.

Constitutional provisions conferring privileges are self-executing where the language used is positive and complete, independent of legislation. McGrew Coal Co. v. Melon, 315 Mo. 798, 287 S.W. 450, 47 S. Ct. 456; 16 C.J.S. 104, para. 51. A provision as to the method of electing certain officers, which is complete in itself and does not require legislation to give it effect, is self-executing. State v. Thoman, 10 Kan. 191; DeWoodey v. Belding, 210 Cal. 461, 292 P. 265.

The word "shall," as used in the exception clause, is usually imperative and mandatory. People v. City of Buenaventura, 213 Cal. 637, 3 P. 2d 3.

Governments are not founded to sanction either official assumption of power not conferred nor abuse of powers that are, but to conserve public welfare. Cawthorn v. Town, etc., 88 Fla. 324, 102 So. 250. If, as in Kansas, the Legislature is not like an academy of science or a Lodge of Odd Fellows, capable of indefinite expansion, neither is it within legislative power to decrease membership except as specifically provided. Section 19, art. 5, Const.

The certificate of election is prima facie evidence of right to legislative membership. Territory ex rel. Sulzer v. Canvassing Bd., 5 Alaska, 602. And it is the duty of courts to require public officers to comply with the state law. Brown v. Suffolk County, supra.

President Lincoln relied upon the "sister" or departmental rule Federally existing, and classified Supreme Court decisions between those affecting private rights, which were binding, and others affecting Federal questions, concerning the whole people. Richardson's Message XI-9. Jackson, likewise, had recourse to the Federal political rule, for, according to Horace Greeley, 1 Am. Conflict 106, the President said, "Well, John Marshall has made his decision; now let him enforce it". And the decision was not enforced. Worchester v. Ga., 6 Peters, 515.

The Supreme Court of the United

States and all inferior Federal courts, in the exercise of judicial powers of the United States, are, by article 3, Const. U. S., restricted in the exercise of their jurisdiction to "such exceptions and under such regulations as Congress" has made. So, then, it is natural and proper that high regard be had Federally to exceptions as are made or which may be made in Federal cases. And this accounts for the reluctance of the Federal courts to exercise jurisdiction in all cases at law and in equity.

Courts of the state are not bound by limitations; they exercise an unlimited and legislatively unlimitable jurisdiction. They are to be governed in the exercise of power and authority judicially by that which is judicial in its nature. It is significant that justiciable issues are not limited to litigation between man and man or as to private controversies, but that these, within the state, extend to controversies between a citizen and his government, and it is understood that courts in such matters presented to them are not limited to property rights but will, in a people's government, enforce the right of citizenship, inclusive of those things pertaining to the elective franchise which so vitally affect rights of property.

For these reasons, I dissent.